IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BRU MCMARTIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:08-CV-0297-K |
| | § | |
| OFFICEMAX INCORPORATED, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant's Motion for Summary Judgment, filed January 2, 2009, and Defendant's Objections to and Motion to Strike Plaintiff's Summary Judgment Evidence, filed February 5, 2009, and Defendant's Motion for Leave to File its Supplemental Brief in Support of its Motion for Summary Judgment, filed July 16, 2009. Following its review and consideration of the motions, responses, replies, summary judgment record, and the applicable law, the court rules that Defendant's Motion for Summary Judgment is **granted**, and Plaintiff's age discrimination claims are **dismissed with prejudice.** Defendant's Motion to Strike and Defendant's Motion for Leave to File its Supplemental Brief are both **denied as moot.**

### I.   Factual and Procedural Background

The majority of the facts described herein are presented in the summary judgment record as undisputed. However, where facts are disputed they are stated in the light

1

most favorable to Plaintiff, the non-movant. Plaintiff Bru McMartin ("McMartin") was employed by Defendant OfficeMax, Inc. ("OfficeMax") and its predecessor company beginning in 1973. McMartin held various positions with OfficeMax over the next 33 years. He was promoted to the position of Operations Director in OfficeMax's Dallas Customer Fulfillment Center (the "Dallas CFC") in 2006.

Beginning in 2005, OfficeMax began using several metrics to measure the performance of each of its CFCs. These metrics were known as the "CFC Dashboard." Data uploaded from each facility was compiled by OfficeMax corporate headquarters each month and compiled into a Dashboard report, which was then distributed back to each CFC's Operations Director. As an Operations Director, McMartin reviewed the Dashboard report and discussed it with his supervisor. The two Dashboard metrics pertinent to this case are 1) the logical warehouse; and 2) ATRs open greater than six days.

The logical warehouse metric compares the percentage of inventory in a CFC's logical warehouse with the CFC's total inventory. The logical warehouse is a virtual warehouse used for product that cannot be included in sellable inventory because the product is damaged, missing, misplaced, or is a customer return. Product placed into the logical warehouse is researched and processed by a CFC's inventory control specialists (the "ICS team") on a daily basis before being transferred out of the logical warehouse and back into the physical warehouse. Through this process, the volume of inventory

2

Case 3:08-cv-00297-K   Document 48   Filed 07/27/09   Page 3 of 16   PageID 833

in the logical warehouse does not continue to accrue without resolution. The Dashboard metric used for the logical warehouse is 0.25 percent, meaning no more than .25 percent of a facility's total inventory should be in the logical warehouse awaiting resolution. Another metric used by OfficeMax was the percentage of ATRs (Authorization to Return) open greater than six days. ATRs pertain to a customer's formal request to return product. OfficeMax policy required the resolution of ATRs within six days, so that customers would receive credit to their accounts in a timely fashion. Both of these metrics were reported as part of the Dashboard reporting process.

During McMartin's tenure with the Dallas CFC, the ICS team consisted of Dalinda Rutledge ("Rutledge"), Susan Romero ("Romero") and Pam Hobkirk ("Hobkirk"). Rutledge resigned in March 2007 and was replaced by Rhonda Aguilar ("Aguilar"). The ICS team reported to, and was managed by, Distribution Manager John Holloway ("Holloway"). Holloway reported to McMartin.

Rutledge says that in the Spring of 2005, McMartin instructed her to transfer enough inventory out of the logical warehouse at the end of each Dashboard reporting period so that there was no more than $30,000 in product inventory in the logical warehouse. Rutledge would then move the inventory back into the logical warehouse after the end of the reporting period, so that its status could be resolved. Rutledge objected to such a practice, but claims that McMartin dismissed her concerns and instructed her to move the inventory out of the logical warehouse as instructed.

3

McMartin denies that he ever gave Rutledge such an instruction or that he knew about the manipulation of the inventory in the logical warehouse.

Rutledge told Holloway that McMartin had instructed her to move inventory out of the logical warehouse, keeping the level of inventory to no more than $30,000. Holloway testified that he raised the issue with McMartin, who told him to continue the process of shifting inventory out of the logical warehouse. Rutledge continued to do so until her resignation from OfficeMax in March 2007.

McMartin began reporting to Regional Vice President Cherie Janetzke ("Janetzke") in 2006. On September 26, 2006 Janetzke sent McMartin a memo criticizing his performance. McMartin was surprised by the memo and believed that the criticisms it contained were inaccurate. Specifically, the memo stated that McMartin had had prior meetings with Bill Grueber ("Grueber") and Janetzke's supervisor Larry Hartley ("Hartley") regarding his performance. McMartin denies that Grueber or Hartley had ever counseled him on his performance.

A day or two after he received the memo, McMartin spoke with Hartley, who purportedly told McMartin that he was "looking for new talent, young, fresh ideas, in with the new regime, out with the old," and also commented that he did not think McMartin could change. Hartley also asked McMartin if he was willing and able to adjust to OfficeMax's new top-down management structure. McMartin told him "yes," and Hartley responded that was all he could ask of McMartin.

4

McMartin believes that after he began reporting to Janetzke, she treated him differently than OfficeMax's other Operations Directors. OfficeMax received a new account in December 2006 (the "Health Trust" account) that was projected to bring in $90 million in revenue, $10 million of which would go to the Dallas CFC. Despite the additional revenue generated by the Health Trust account, Janetzke did not increase McMartin's budget or permit him to hire any additional employees. According to McMartin, OfficeMax's Miami location was permitted to hire additional workers.

As noted above, Rutledge resigned from OfficeMax in March 2007. Rutledge was replaced by Aguilar. Following Rutledge's resignation, the Dallas CFC began to experience poor performance ratings with regard to the logical warehouse. McMartin was concerned that the ICS team did not understand the logical warehouse well enough and did not spend the requisite amount of time on it. McMartin expressed these concerns to Holloway in April, who agreed to provide the ICS team with additional training. Unfortunately, the logical warehouse metric did not improve in May. McMartin then coordinated a training session for the ICS team with Patsy Ezelle ("Ezelle") in late June 2007. After the training with Ezelle, McMartin held a follow up meeting with the ICS team on July 12th, re-emphasizing that the logical warehouse performance must be improved. One concern McMartin raised was that employees on the ICS team were frequently out on vacation, which contributed to the logical warehouse "taking a back seat" to other departmental responsibilities.

Meanwhile, the ICS team requested a meeting with Janetzke. Romero, Hobkirk and Aguilar told Janetzke that at McMartin's direction, Rutledge had moved inventory out of the logical warehouse prior to the end of each reporting period, creating the appearance that there was less inventory in the logical warehouse than there should have been. They further stated that after Rutledge left, they did not continue this practice, thus causing the poor performance of the logical warehouse. Romero, Hobkirk, and Aguilar also said that the warehouse was in disarray and that a lot of the additional work created by that disarray was falling on the ICS team.

Janetzke, Human Resource Field Director Mark LaRocca ("LaRocca"), Regional Loss Prevention Manager Joey Reyes ("Reyes"), and Dallas Human Resources Manager Scharlotte Mendoza ("Mendoza") investigated the ICS team's allegations against McMartin. The ICS team and Holloway all confirmed that the process of moving inventory in and out of the logical warehouse had been undertaken at McMartin's instruction. The Dallas CFC's inventory transactions were also audited in the course of the investigation, and the audit showed a consistent pattern of inventory leaving the logical warehouse at the end of the reporting period, and identical inventory returning to the logical warehouse at the beginning of the new reporting period, appearing to confirm the ICS team's assertions that the logical warehouse data had been manipulated.

During the investigation, Holloway also told Reyes that sometime before 2005, McMartin had directed the cancellation of all ATRs older than six days, whether or not

6

there had been any attempt to communicate with the customer and/or retrieve the customer's return. Office Manager Dorothy Smith ("Smith") corroborated Holloway's statement regarding McMartin's directive to cancel the ATRs, because the Dashboard metrics for the ATRs had taken a negative downturn.

Through its investigation, OfficeMax obtained five statements from current and former employees regarding manipulation of the logical warehouse and/or ATR data. Reyes, LaRocca, and Janetzke met with McMartin on July 17, 2007. McMartin was told that his employment with OfficeMax was being terminated for instructing employees to manipulate the logical warehouse and ATR data in order to increase the Dallas CFC's Dashboard performance ratings. McMartin adamantly denied (and continues to deny) OfficeMax's stated reason for his discharge, and maintains he was unaware that his subordinate employees were manipulating the inventory data. Holloway was also terminated for failing to report the data manipulation.

In addition to the September 2006 age-related comments described above, McMartin contends that Janetzke made further age-related remarks to him in 2007. In late June 2007, McMartin and Janetzke attended an OfficeMax regional meeting in Massachusetts. As he was leaving to return to Dallas, he and Janetzke briefly spoke about performance issues in the Dallas CFC. McMartin alleges that Janetzke commented that "if you don't think I can take you out of the organization because of your age or your tenure, you watch me." He further states that sometime between this

7

remark and July 10, 2007, Janetzke told him that:

> My expectation of you based on age, tenure, and ability with the company is different than some of my other less-tenured managers. You should be setting the bar.

Finally, McMartin alleges that on or around July 10, 2007, Janetzke repeated the comment previously made in Massachusetts.

McMartin sued OfficeMax in state court on January 15, 2008, alleging that he was discharged because of his age, in violation of the Texas Commission on Human Rights Act ("TCHRA"), Tex. Lab. Code § 21.001, *et seq.,* and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* OfficeMax subsequently removed the case to this court, and now moves for summary judgment.

## II.   Summary Judgment Standard

Summary judgment is appropriate when the pleadings, affidavits and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2551 (1986). The moving party bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 322-25, 106 S.Ct. at 2551-54. Once a movant makes a properly supported motion, the burden shifts to the nonmovant to show that summary judgment should not be granted; the nonmovant may not rest upon allegations in the pleadings, but must support the response to the motion

8

with summary judgment evidence showing the existence of a genuine fact issue for trial. *Id.* at 321-25, 106 S.Ct. at 2551-54; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-57, 106 S.Ct. 2505, 2513-14 (1986). All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993 (1962).

**III.    OfficeMax's Motion for Summary Judgment**

OfficeMax contends that there is no genuine issue of material fact whether it discharged McMartin on account of his age, and that therefore his age discrimination claims must be dismissed. For the reasons stated below, the court agrees.

**A.    Applicable Legal Standards for Age Discrimination Claims**

Although McMartin relies upon both the ADEA and the TCHRA to provide a statutory basis for his age discrimination claim, it is well established that Texas state courts coordinate and conform with federal authority under the ADEA in applying the TCHRA's provisions against age discrimination. *See Caballero v. Central Power and Light Co.,* 858 S.W.2d 359, 361 (Tex. 1993) (a stated purpose of the TCHRA is to coordinate and conform with federal employment discrimination laws, including Title VII and the ADEA). Therefore, these claims may be considered together.

Under the ADEA, it is illegal for an employer to fail or refuse to hire an individual or otherwise discriminate against an individual with respect to the terms and conditions of his employment due to his age. 29 U.S.C. § 623(a)(1). The TCHRA similarly

prohibits an employer from discharging or discriminating against an employee due to the employee's age. Tex. Lab. Code § 21.051; *Quantum Chemical Corp. v. Toennies,* 47 S.W.3d 473, 475 (Tex. 2001). To prevail on an age discrimination claim, a plaintiff must demonstrate a *prima facie* case of discrimination, and the defendant must then articulate a legitimate, non-discriminatory reason for its decision. *Machinchick v. PB Power, Inc.,* 398 F.3d 345, 352 (5th Cir. 2005), *citing Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 312 (5th Cir. 2004).

If the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact whether the employee's age was a but-for cause of the employer's adverse action. *Gross v. FBL Fin. Svcs., Inc.,* ____U.S.____, 129 S.Ct. 2343, 2350-51 (2009). Stated another way, the employee must show that the employer's proffered reason for its decision is pretextual, and that age bias is the real reason for the employer's decision. *Smith v. City of Jackson, Miss.,* 351 F.3d 183, 196 (5th Cir. 2003), *aff'd* 544 U.S. 228 (2005); *West v. Nabors Drilling USA, Inc.,* 330 F.3d 379, 385 (5th Cir. 2003). The evidence offered to counter the employer's proffered reasons must be substantial. *Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212, 220 (5th Cir.2001), *citing Auguster v. Vermilion Parish Sch. Bd.,* 249 F.3d 400, 402 (5th Cir.2001).

Workplace comments may be used as direct or circumstantial evidence of employment discrimination. Direct evidence is evidence which, if believed, if believed,

proves the fact in question without inference or presumption. *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir.2003). In the employment discrimination context, this includes "any statement or document which shows on its face that an improper criterion served as the basis for an adverse employment action." *Id.* at 415. However, if an inference is required for the evidence to be probative as to an employer's discriminatory animus in terminating the former employee, the evidence is circumstantial, not direct. *Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 897-98 (5th Cir.2002).

In order for a discriminatory comment or remark to constitute direct evidence of employment discrimination, the Fifth Circuit holds that the comment must meet the strict four-factor test set forth in *Brown v. CSC Logic, Inc.*, 82 F.3d 651 (5th Cir.1996); *see also Acker v. Deboer, Inc.,* 429 F.Supp.2d 828, 838 (N.D.Tex.2006). Under the *CSC Logic* test, a workplace remark constitutes direct evidence of discrimination if it is: (a) related to the protected class of persons of which the plaintiff is a member, (b) proximate in time to the employment decision at issue, (c) made by an individual with authority over the employment decision at issue, and (d) related to the employment decision at issue. *Brown,* 82 F.3d at 655; *Acker,* 429 F.Supp. at 838.

Where an alleged remark does not qualify as direct evidence of discrimination under the four-factor *CSC Logic* test, it may still be probative of discriminatory intent, so long as it is accompanied by other evidence of pretext. *Palasota v. Haggar Clothing*

11

*Co.,* 342 F.3d 569, 577 (5th Cir. 2003); *see also Auguster,* 249 F.3d at 406. Here, McMartin does not assert that the alleged age-related comments constitute direct evidence of discrimination, and employs a circumstantial evidence analysis in attempting to raise a genuine issue of material fact concerning his claim of age discrimination.

      B.      Analysis

OfficeMax does not dispute McMartin's ability to establish a *prima facie* case of age discrimination. Therefore, the court moves to the second stage of the *McDonnell Douglas* framework – whether Office Max has carried its burden of articulating a legitimate, non-discriminatory reason for McMartin's discharge. OfficeMax states that it terminated McMartin's employment because it determined as a result of its investigation that McMartin had directed the manipulation of data affecting the virtual warehouse and ATR Dashboard metrics. Accordingly, the court determines that OfficeMax has set forth a legitimate, non-discriminatory reason for its adverse employment action. Because OfficeMax has carried its burden of production, McMartin must set forth sufficient evidence raising a genuine issue of material fact whether OfficeMax's given reason for his discharge is a pretext for unlawful age discrimination.

In his response, which was submitted prior to the Supreme Court's decision in *Gross,* McMartin argues that he is able to raise a genuine issue of material fact under both the mixed-motive and pretext alternatives, which were previously available to ADEA plaintiffs. *See, e.g., Machinchick,* 398 F.3d at 352; *Rachid,* 376 F.3d at 312.

However, McMartin vehemently denies that he ever directed other OfficeMax employees to manipulate the logical warehouse and/or ATR data. Therefore, even if the mixed-motive alternative were still available to him, because McMartin does not concede that OfficeMax's reason for terminating his employment is even partially true, he must proceed under the pretext standard. *See, e.g., Richardson v. Monitronics Intl., Inc.,* 434 F.3d 327, 333 (5th Cir. 2005) (mixed-motive framework applies where employee concedes that discrimination was not the *sole* reason for his or her discharge) (emphasis in original); *Jackson v. Watkins,* 2009 WL 1437824, *7 (N.D. Tex. 2009) (employee who did not admit that any of employer's reasons were true opted to proceed under pretext model and was required to show that employer's proffered reasons for its actions were pretextual); *Kretchmer v. Eveden, Inc.,* 2009 WL 854719, *7 n.8 (N.D. Tex. 2009) (same).

To survive summary judgment, McMartin must set forth evidence disputing OfficeMax's proof that after the ICS team complained to Janetzke, it investigated those allegations and found that McMartin had directed the manipulation of the virtual warehouse and ATR data. McMartin does not dispute that ICS team employees brought concerns to Janetzke, that OfficeMax investigated, and that it gathered information (whether accurate or not) that showed Mc Martin had instructed OfficeMax employees to manipulate data affecting the Dashboard performance reports. Instead, he argues that OfficeMax's articulated reason for its decision is untrue because it is incorrect, i.e., he did not instruct employees to do so.

13

Although OfficeMax may have been mistaken about what actually took place, the court's concern on summary judgment is whether OfficeMax's perception of what took place, whether accurate or not, was the real reason for McMartin's termination. *Laxton v. Gap, Inc.,* 333 F.3d 572, 579 (5th Cir. 2003); *Evans v. City of Houston,* 246 F.2d 344, 355 (5th Cir. 2001). It is not whether Office Max's proffered reason was an *incorrect* reason for his discharge. *Laxton,* 333 F.3d at 579 (emphasis in original); *Sanstad,* 309 F.3d at 899. The pertinent inquiry is whether the evidence supports an inference that OfficeMax intentionally discriminated against McMartin.

It is well established that employment discrimination laws are not intended to be a vehicle for transforming the courts into personnel managers who second-guess the business decisions of employers. *Bryant v. Compass Group USA Inc.,* 413 F.3d 471, 478 (5th Cir. 2005), *cert. denied,* 126 S. Ct. 1027 (2006); *Bienkowski v. American Airlines, Inc.,* 851 F.2d 1503, 1507-08 (5th Cir. 1988). Management does not have to make proper decisions, only non-discriminatory ones. *Bryant,* 413 F.3d at 478, *citing Little v. Republic Refining Co.,* 924 F.2d 93, 97 (5th Cir. 1991). McMartin has not disputed OfficeMax's perception, at the time of his discharge, that he had improperly required subordinates to manipulate the virtual warehouse and ATR data. Accordingly, his disagreement with OfficeMax's view of the facts uncovered in the course of its investigation does not raise a material fact issue.

Beyond arguing that OfficeMax wrongly concluded that he had manipulated key performance data, McMartin attempts to raise a fact issue by stating that when OfficeMax received the Health Trust account, he was not permitted to hire additional staff, whereas the Operations Director in OfficeMax's Miami location (McMartin's younger counterpart) was allowed to hire more employees.  To raise a genuine issue of material fact regarding pretext, McMartin must show that OfficeMax treated him less favorably than younger employees in "nearly identical" circumstances. *Bryant,* 413 F.3d at 478; *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.,* 245 F.3d 507, 514 (5th Cir. 2001). McMartin offers no evidence to show that his circumstances were "nearly identical" to those of the Miami Operations Director.  The vague, conclusory assertions he has submitted are not sufficient to raise a genuine issue of material fact regarding pretext.

Lastly, McMartin relies upon the age-related statements made by Hartley and Janetzke to show pretext.  As the Fifth Circuit has instructed, such remarks may be probative of discriminatory motive, where they are accompanied by *other evidence of pretext.  Palasota,* 342 F.3d 569, 577 (5th Cir. 2003); *see also Auguster,* 249 F.3d at 406 (emphasis added).  Here, McMartin does not set forth the "other evidence" required to shore up his proof of comments referencing his age.  Thus, those comments cannot alone permit McMartin to survive summary judgment, and his claims must be dismissed.

    **IV.    Defendant's Objections to and Motion to Strike Plaintiff's Summary Judgment Evidence**

Also before the court are OfficeMax's Objections to and Motion to Strike

15

McMartin's Summary Judgment Evidence. The court reaches the same resolution of OfficeMax's Motion for Summary Judgment whether or not it considers the evidence OfficeMax objects to. Accordingly, the motion to strike is **denied as moot.**

### V.     Defendant's Motion to Supplement

Defendant has moved to supplement its summary judgment briefing to include a discussion of the *Gross* decision. Because the court has already considered the impact of the *Gross* decision on McMartin's ADEA claims, the court finds that supplementation of Defendant's briefing is unnecessary, and would only serve to delay the entry of judgment in this case. Therefore, Defendant's Motion to Supplement is **denied as moot.**

### VI.     Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is **granted**, and McMartin's claims are hereby **dismissed with prejudice.** Judgment will be entered by separate document.

**SO ORDERED.**

Signed July 27th, 2009.

*Ed Kinkeade*
ED KINKEADE
UNITED STATES DISTRICT JUDGE